**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Case No. 1:23-cr-00343** |
| **v.** ) | |
| ) | **The Honorable Ana C. Reyes** |
| **CHARLES EDWARD LITTLEJOHN,** ) | |
| ) | **Sentencing Hearing: January 29, 2024** |
| **Defendant.** ) | |

### DEFENDANT CHARLES LITTLEJOHN'S
### MEMORANDUM IN AID OF SENTENCING

Mr. Littlejohn comes before the Court for sentencing having cooperated with the government and admitted that he stole tax records from an IRS database and provided them to the press. He committed this offense out of a deep, moral belief that the American people had a right to know the information and sharing it was the only way to effect change. He did what he thought was right at the time, but now fully acknowledges that he was wrong. Mr. Littlejohn recognizes the grave impact of his actions not only on the victims whose tax data he leaked to the media, but also on the very system that he hoped to improve. He violated a trust and stands before the Court ready to accept his punishment.

The U.S. Sentencing Commission established an applicable Guideline for this offense of 4 to 10 months, with a potential upward departure if the offense involved "tax return information of a substantial number of individuals." USSG §2H3.1, App. Note 5. Mr. Littlejohn is 38 years old, a first-time offender with a commendable past who committed this offense not for personal gain, not out of personal malice, but out of a belief that his violation of law would serve the public interest. Yet, the Government argues that his conduct requires punishment six times greater than the maximum Guideline sentence for this offense. General deterrence is only one of the statutory

sentencing factors, and cannot overwhelm the other sentencing factors to justify such an extreme sentence. The government has failed to identify a single authority that would warrant a six times upward departure for a non-violent act without any personal economic gain or motive. The defendant was wrong to violate the law even if he believed it would serve the public interest. It is also wrong for the Government to request six times the Guidelines maximum on the facts of this case.

The Court may at once take this conduct seriously while at the same time confer a just sentence. As discussed below, a Guidelines sentence with a two- to four-level upward departure, is "sufficient but not greater than necessary" to punish Mr. Littlejohn in this case.

## I.      THE PLEA AGREEMENT AND SENTENCING GUIDELINES

Mr. Littlejohn pled guilty on October 12, 2023 to one count of Unauthorized Disclosure of Income Tax Returns in violation of 26 U.S.C. § 7213(a)(1). The maximum punishment for this offense is five years imprisonment, a $5,000 fine, and the costs of prosecution. Under the terms of the written plea agreement (Dkt. 8), Mr. Littlejohn and the government have agreed to recommend certain United States Sentencing Guidelines that apply to his offense conduct. *See id*. at ¶9. The parties agreed the appropriate offense Guideline is U.S.S.G. § 2H3.1, with a base offense level of nine (9) plus a two (2) level increase under §3B1.3 for abuse of position of trust/use of a special skill and a two (2) level increase under §3C1.1 for obstruction of justice – resulting in an Adjusted Offense Level of 13. *Id.* The parties also understood that, at sentencing, the government would seek an upward departure under USSG §2H3.1, App. Note 5.

As part of the Plea Agreement, the Parties further agreed that Mr. Littlejohn would receive a two (2) level reduction for acceptance of responsibility under §3E1.1(a) and would be eligible for an additional two (2) level reduction under USSG §4C1.1 (assuming that Guideline had taken

effect prior to sentencing). *See* Draft Presentence Investigation Report ("Draft PSR"), Dkt. 16, ¶¶ 39, 84.   The Presentence Report confirms that both reductions should apply and that Mr. Littlejohn's Total Offense Level is therefore 9.  Mr. Littlejohn has a criminal history score of zero, which places him in Criminal History Category I, resulting in a Guideline range of four (4) to ten (10) months imprisonment (in Zone B of the Sentencing Table).  *Id.*

### A.     Upward Departure Pursuant to USSG §2H3.1

Mr. Littlejohn concedes that an upward departure from the above Guideline range is appropriate in this case based on the fact that his disclosures involved "tax return information of a substantial number of individuals." USSG §2H3.1, App. Note 5.  That said, any departure must be grounded in the Guidelines and reasonably justified by the conduct.  Here, the government has asked the Court to depart upward and to sentence Mr. Littlejohn to the statutory maximum of 60 months—which is equivalent to a *15-level* upward departure from his actual Offense Level of 9.  Such a departure ignores precedent and is not proportional to the conduct.

While the Guidelines are no longer mandatory, they "remain the starting point and the initial benchmark for sentencing, ... [and] thus continue to guide district courts in exercising their discretion by serving as the framework for sentencing[.]" *United States v. Khatallah*, 41 F.4th 608, 648 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2667, (2023) (citing *Beckles v. United States*, 580 U.S. 256 (2017) (internal quotation marks and citation omitted)).  The district court must explain the basis for its chosen sentence on the record.  *Peugh v. United States*, 569 U.S. 530, 537 (2013) (citing *Gall v. United States*, 552 U.S. 38, 50 (2007).  A major departure from the Guidelines should be supported by a more significant justification than a minor one. [1]  *Id.*

---

[1]       In its 2023 *Primer on Departures and Variance*, the U.S. Sentencing Commission provides the following examples of upward departures and variances: *United States v. Martinez-Armestica*, 846 F.3d 436, 447 (1st Cir. 2017) (affirming variance where defendant's conduct "went beyond the ordinary conduct proscribed by the statute" to include "repeated, threatening use of firearms" and "[r]ather than simply brandishing a weapon, [defendant] pointed

Accordingly, although the Guidelines should be the starting point and the initial benchmark, district courts may impose sentences within statutory limits based on appropriate consideration of all of the relevant sentencing factors, subject to appellate review for "reasonableness." *Pepper v. United States*, 562 U.S. 476 (2011).  A sentencing judge does not have unfettered discretion to depart from the applicable sentencing guidelines.  *United States v. Molina*, 952 F.2d 514, 521 (D.C. Cir. 1992).  A district court's "responsibility to respect the Guidelines' underlying policies of uniformity and proportionality in sentencing does not end when the court departs from the sentencing grid; indeed, that responsibility becomes more weighty because it is unguided departures that pose the greatest danger of undermining sentencing uniformity." *Id*. (citing *United States v. Jackson*, 921 F.2d 985, 989 (10th Cir.1990) (*en banc*)).  Therefore, "A judge may not say: I have decided to depart, so I now throw away the guidelines." *Id*. (citing *United States v. Ferra*, 900 F.2d 1057, 1061-62 (7th Cir.1990)) (internal quotation marks omitted).

By statute, the base offense level for Unauthorized Disclosure of Income Tax Returns is 9. In Mr. Littlejohn's case, with the agreed enhancements for abuse of power and obstruction of justice and credit for acceptance of responsibility and being a zero-point offender, his total Offense Level is also 9.  Draft PSR ¶¶ 39, 84.  There is little precedent for upward departures in leak cases – even those involving thousands of records.  For example, in *United States v. Edwards*, the

---

the gun directly at one of the carjacking victims, holding it against her head"); *United States v. Lente*, 759 F.3d 1149, 1164–66 (10th Cir. 2014) (affirming upward variance to: account for the multiple deaths caused by the defendant's conduct; reflect the defendant's extreme recklessness by driving with a blood alcohol level almost three times the legal limit; properly represent the defendant's criminal history; and address the defendant's continued post-conviction substance abuse and criminal conduct); *United States v. Dehghani*, 550 F.3d 716, 723 (8th Cir. 2008) (affirming upward variance because the seriousness of the defendant's conduct— obsession with child pornography; exposing his children to such pornography; physical sexual contact with a minor; threatening the judge, jail personnel, and others; and attempting to manipulate and obstruct the criminal justice system—outweighed any mitigating factors). U.S. Sentencing Comm'n, *Primer on Departures and Variance*, 38, n.224 (2023).

4

defendant disclosed to Buzzfeed over 50,000 highly sensitive Financial Crimes Enforcement Network documents related to then-President Trump. Like the instant case, the records contained significant personal financial information of individuals that became the basis of an online investigative journalism series ("The FinCEN Files"). 1:19-cr-00064-GHW-1 (S.D.N.Y.). At sentencing, the Judge stated: "I considered whether there is an appropriate basis for departure from the advisory range within the guidelines system, and while I recognize that I have the authority to depart, I do not find any other grounds warranting a departure under the guidelines." *See United States v. Edwards*, Case No. 1:19-cr-00064-GHW-1 (S.D.N.Y.), Dkt. 104 at 6.

### B. Zero-Point Offender

As a "Zero-Point Offender," the Guidelines provide that "[i]f the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range is in Zone A or B of the Sentencing Table, a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3), is generally appropriate." App. Note 10 to §5C1.1 (citing 28 U.S.C. § 994(j)). While Mr. Littlejohn does not seek a probationary sentence and recognizes that an upward departure might remove him from Zone B, he asks that the Court consider the Zero-Point Offender Guideline to mitigate his sentence.

As discussed further below, a guideline range with a two- to four-level departure is sufficient but not greater than necessary in this case.

### II. THE 18 U.S.C. § 3553(a) SENTENCING FACTORS SUPPORT A SENTENCE BASED ON THE GUIDELINES.

Section 3553(a) requires district courts to consider the following factors in imposing sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, a guidelines sentence with a two to four-level departure is "sufficient but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

A.     **Mr. Littlejohn's Personal History and Characteristics.**[2]

"The punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949).

Charles Edward Littlejohn is 38 years old.  Until the instant offense, he has been a law-abiding citizen whose life has been defined by public service, community, and devotion to his family and friends.  The many support letters to the Court are proof of that life.  Each speaks about the individual, personal impact that Charles Littlejohn has had on so many people through quiet acts of kindness and grace.  "*What speaks most to his character is not the one grand gesture, but countless small acts of thought, gestures of friendship, and time spent that, over the years, provided healing.*"  ███████ Letter, attached hereto as part of Exhibit A.

The letters paint a picture of a person who, from childhood, has always acted with deep empathy and a desire to make the world a better place.  Even after learning of Mr. Littlejohn's

---

[2]     *See generally* Draft Presentence Investigation Report, Dkt. 16.

crime, his family, friends, and former colleagues have all written about his character.   As his

childhood friend, ███████████ wrote to the Court:

> *While I understand Chaz broke the law, I will still vouch for the quality of his character.  Mr. Littlejohn is someone I can always count on to show up and support me both wherever I am and whoever I am.  He is a person who has always valued loyalty, creativity, understanding, and empathy.  Time and time again, I watched as Mr. Littlejohn showed up for the people closest to him.*

██████ Letter, attached hereto as part of Exhibit A.

A college friend, ██████████, who is now a professor of philosophy of law observed:

> *I teach my students that there is no such thing as a "good" person or a "bad" person.  We are all just people who do things the law considers good or bad.  But if anyone is a good person, Chaz is.  I have never known him to make any big decisions with much regard for the negative consequences he might face.  Those are the rare people I can say are categorically good people.*

████ Letter, attached hereto as part of Exhibit A.

### 1.     Personal Background of Charles "Chaz" Littlejohn

Charles Littlejohn ("Chaz" to his close friends) grew up St. Louis, Missouri.  His parents

divorced when he was five years old and both soon remarried, leaving Mr. Littlejohn as the only

child moving back and forth between two separate families per a court-ordered schedule.  While

the divorce was disruptive to young Mr. Littlejohn, he learned to adapt and formed close bonds

with his siblings – especially his younger brother and sisters.  As his younger brother, ██████

██████, explained:

> *Even though Charles is my half brother, due to our relationship, I have always just referred to him as my brother. My entire life, I have looked up to Mr. Littlejohn…. He has a great many friends and family who love him and rely on him. He is always there when asked for help and never asks for anything in return. He has supported me my entire life and I would not be half the person I am without his tutelage.*

██████ Letter, attached hereto as part of Exhibit A.

He excelled in school and was an active member of his local church.  Many of the letters

from childhood friends share examples of how, from a young age, Mr. Littlejohn went out of his

way to be a supportive and inclusive peer.  Friend ███████████ wrote about how he met Mr. Littlejohn in the 7th grade, soon after emigrating from Romania to Missouri:

> *At a time when the language barrier made it hard for me to find friends and fit in with fellow classmates, Chaz was one of the first people to embrace me and we became friends quickly.  This friendship has lasted for over 25 years, as he is one of my two oldest friends, and I was honored that he was one of the 3 groomsmen at my wedding in 2017.*

████ Letter, attached hereto as part of Exhibit A.

Mr. Littlejohn attended college at the University of North Carolina at Chapel Hill.  Outside of his studies, Mr. Littlejohn devoted much of his time to volunteering on campus, including working to help found an organization that has evolved into a global non-profit for sustainable solutions to hunger.  Of the letters from college friends, most met Mr. Littlejohn while volunteering for this organization or at the campus social justice hub.

In 2007, Mr. Littlejohn graduated from university with a B.A. in Economics (*summa cum laude*) and a B.A. in Physics.  He immediately moved to Washington, D.C.—renting a room in a house with a group of other recent graduate.  Mr. Littlejohn has maintained friendships with his former housemates, many of whom have not only written letters of support, but are traveling to Washington to visit with Mr. Littlejohn the weekend before his sentencing.  As one friend wrote: *We want to show him that we are here for him the way we know he would be there for us, as a loyal friend.* ████ Letter, attached hereto as part of Exhibit A.

At a time when most of his friends flocked to Washington to work on the Hill or for a passionate cause, Mr. Littlejohn chose a federal consulting role focused on the IRS.  As a college friend ███████████ shared:

> *While he was always brilliant enough to work anywhere, he is motivated by working for the public good, and he turned down more lucrative job opportunities to build a career around strengthening government capacity.  He's not just one of the most*

> *informed citizens I know, but someone who is inherently excited to make*
> *government a better provider of public services.*

████ Letter, attached hereto as part of Exhibit A.  Another college friend echoed those

sentiments:

> *I remember my initial befuddlement at Chaz choosing to work for the IRS, via a*
> *renowned consulting firm: It was, even then, a striking outlier among our friends.*
> *But what has stayed with me was his rationale. He believed, quite simply, that*
> *government should work better: that equitable education, healthcare,*
> *environmental safety, housing, and public parks — the very things we were quick*
> *to care about — depended on a functioning IRS: on taxpayer dollars, on people*
> *paying no more and no less than their fair share.*

████ Letter, attached hereto as part of Exhibit A.

## 2.    Federal Consulting Work for the Internal Revenue Service.

But for the instant conduct, Mr. Littlejohn was a talented and devoted IRS contractor.

Despite widespread media portrayals of Mr. Littlejohn as a disgruntled, politically-jaded federal

consultant, nothing could be further from the truth.  One of his former consulting colleagues wrote

to the Court:

> *At work, Chaz was diligent, and he approached each task, no matter how mundane,*
> *with enthusiasm and pride. He devoted his time to improving public service not by*
> *delivering meandering speeches about government efficiency but by doing the hard*
> *work – brick by brick, datapoint by datapoint, he labored over obscure processes*
> *and unglamorous spreadsheets in pursuit of the perfect combination of incremental*
> *changes to make things just a little bit better for everyone. While some of his*
> *colleagues cynically completed only the basic tasks required, Chaz was passionate*
> *about connecting his work to broader themes he had studied or was reading about.*
> *And I don't know anyone that appreciated the New Carrolton Federal Building like*
> *he did. Above all, he took his pledge to do good for the public seriously, and in our*
> *time together, I never saw him act with anything but the highest standards and*
> *integrity.*

██ Letter, attached hereto as part of Exhibit A.  It is difficult to reconcile this version of Mr.

Littlejohn with the one who so flagrantly violated the law and the trust placed in him by the IRS.

Mr. Littlejohn's criminal conduct in 2019 and 2020 was the product not only of his misguided idealism but of life experience that led him to treat each day as if it were his last.

### 3.    Impact of Younger Sister's Cancer Diagnosis.

Many of the letters to the Court talk about Mr. Littlejohn losing his little sister to cancer. After taking a break from consulting to start an online poker analytics business, Mr. Littlejohn returned to his job as an IRS contractor in 2012.  Several months later, Mr. Littlejohn's younger sister—then a senior in high school—was diagnosed with leukemia.  Despite having just moved back to Washington, Mr. Littlejohn put his own life on hold and relocated to St. Louis to be close to his sister and support his family while she underwent treatment.  As his family wrote in their letter:

> *During ▮▮▮▮▮▮▮ illness, he relocated to St. Louis to help care for her and other members of his family in St. Louis working remotely at all hours of the day and night so that he could support his family and fulfill his job obligations.*

Family Letter, attached hereto as part of Exhibit A.

When his sister completed chemotherapy, Mr. Littlejohn moved back to Washington, only for her to relapse two months later.  He then relocated back to St. Louis to again help care for his sister.  When his sister needed a bone marrow transplant, Mr. Littlejohn went through the painful process of testing in hopes that he would be a match.   When that was unsuccessful, he then "*recruited everyone he knew to sign up for the national registry*" and "*[a]lthough he wasn't a match for his sister, he saved a stranger's life.*" ▮▮▮ Letter, attached hereto as part of Exhibit A. Over the next several months, Mr. Littlejohn watched as his little sister underwent a series of grueling procedures, including more rounds of chemotherapy, a bone marrow transplant, and multiple surgeries.  During this time, Mr. Littlejohn "*spent almost every day with her in and out of the hospital…[and] the nurses and staff…remember him fondly to this day.  He put his entire*



*life on hold to take care of [her].*" ██████ Letter.  After multiple moments of hope that she would survive, ██████ contracted an antibiotic-resistant infection from her treatment and died in November 2013 at age 19.  ██████████████████████████████████████████

██████████████████████████████████████████████████████

His sister's illness and death were very traumatic for Mr. Littlejohn and his family.  After she passed away, Mr. Littlejohn decided to leave his consulting job and stay in St. Louis "*to help his father and stepmother cope with the loss of their youngest child, easing the pain of the empty nest that was forced upon them. His selflessness meant the world to them both.*"  Family Letter, attached hereto as part of Exhibit A.  Among the many small things Mr. Littlejohn did for his family during that time was a project to compile family photographs and social media posts into a program that shares a daily "██████ Memory" with his father and step-mother.  ██████

████████████████████████████████████████████████████

████████████████████████████████████████████

Two weeks after ██████ death, Mr. Littlejohn learned that he was a match for an anonymous cancer patient on the registry.  Over the next two years, Mr. Littlejohn successfully donated both bone marrow and T-cells to that person, and ultimately saved his life.  *See* ██████ Letter, attached hereto as part of Exhibit A.  During that time, Mr. Littlejohn became involved with the non-profit "Be the Match," and joined his father in advocating for more research into antibiotic resistance, including an initiative to educate members of Congress on the need for additional funding.  *See, e.g.* Nancy Curtis, *St. Louis Marrow Donors and Transplant Patients Come Together for the Be the Match Walk+Run This Weekend*, ST. LOUIS MAGAZINE, (Sep. 4, 2014),      https://www.stlmag.com/health/st.-louis-marrow-donors-and-transplant-patients-come-together-for-the-be-the-match-walk-run-this-weekend and The Pew Charitable Trusts, *Advocates*

*gather in Washington to urge sustained funding to combat antibiotic resistance*, (Feb. 26, 2018),

https://www.pewtrusts.org/en/research-and-analysis/articles/2018/02/27/meet-our-supermoms-

2018, excerpts attached hereto as part of Exhibit B.

Mr. Littlejohn spent the next several years focusing on his family, community work, and

his start-up business.  In late 2016, Mr. Littlejohn's grandfather suffered a debilitating stroke.  Mr.

Littlejohn temporarily relocated to Delaware to care for him until his death in July 2017.  *"He did*

*this without being asked, selfless in his devotion to family."*  Family Letter.  That same month, Mr.

Littlejohn's mother ███████████████████████████████████████ and decided it was

time for him to move back to Washington so that he could have a salaried job.  He applied to two

consulting firms, including for a role at his prior firm that might put him on a project to access the

President's tax returns.

### 4.     Return to Washington, D.C. and IRS Consulting Job.

In the fall of 2017, Mr. Littlejohn resumed working for the consulting firm on an IRS

contract (discussed below).  A year and a half later, his family received the devasting news that

███████████████████████████  As he had before, Mr. Littlejohn immediately returned home

to provide support.  Since then:



Family Letter, attached hereto as part of Exhibit A.

### 5.    Personal Consequences

For Mr. Littlejohn, the most difficult part of his upcoming incarceration is not the impact on himself, but the impact on those he loves.  Despite the turmoil of Mr. Littlejohn's life in 2019, that year, he met his girlfriend, ██████████.  They have now been in a committed relationship for over four years and have built a life together.  She wrote to the Court:



████ Letter, attached hereto as part of Exhibit A.  Mr. Littlejohn mourns for the time he will miss with ██████ and no longer being there for his family and friends.  Following his plea, Mr. Littlejohn has made the effort to visit and connect with as many of the important people in his life as he can.  And even with the stress of his upcoming sentencing, a few weeks ago, he traveled to California to care for his younger brother, who was recovering from surgery:

> *He has always checked up on me, as I've had my fair share of struggles in life. This past month, I had surgery that put me out of work for one month. Mr. Littlejohn flew out across the country and took care of me for two weeks, knowing how precious this time is. It helped me out so much and I'm very grateful to him. His support, throughout my life, is why I am here today.*

████ Letter, attached hereto as part of Exhibit A.  As Mr. Littlejohn prepares to be sentenced (and turn 40 next year), he recognizes that his conduct will have lasting consequences well beyond any term of incarceration the Court imposes.  Mr. Littlejohn's relationships with family and friends have been forever strained, his ability to start a family is now at risk, and he may not be there for his Dad.

### B.      The Nature and Circumstances of the Offense.

Mr. Littlejohn's conduct in this case is inexcusable.  He not only broke the law, but breached the trust placed in him by the United States government and violated the privacy of thousands of taxpayers.  It is hard to understand why a man with such respect for the law and government systems would violate them so completely.  As Mr. Littlejohn's ███████████ ████████████████████████ tried to explain:

> *Chaz is a student of history and politics, but he is not inherently political….
> Knowing Chaz for as long as I have, I am sure this was not an easy decision for
> him.  He must have spent considerable time weighing historical precedent, ethics
> and philosophy, ends and means, processes and policy, macro themes and micro
> data, federalism and fairness, and all sorts of concepts and doctrines before coming
> to his decision. I imagine he hoped others would consume the details of the
> reporting and consider our country's tenuous moral moment and evaluate the
> merits of various tax policy proposals in a more data-driven way like he might….*

█ Letter, attached hereto as part of Exhibit A.

### 1.      (Brief) Summary of the Relevant History of Taxation.

As the Court referenced during Mr. Littlejohn's Plea Hearing, the United States first enacted an income tax in 1861, during the Civil War.  That first statute, signed into law by President Lincoln, mandated a flat tax and that citizens publicly file their returns.  After Congress repealed the wartime tax statute in 1872, the country went through several decades of debate as to whether the country should levy an income tax and, if so, how it should function.  In the early 1900s, President Taft recommended that Congress propose the 16th Amendment, which was eventually ratified in 1913 – ushering in the modern income tax system.  While the Amendment afforded Congress the "power to lay and collect taxes," it did not address whether tax records should be public.  This continued to be a matter of some debate.  While some politicians lobbied for an open system (*see, e.g.* Bennjamin Harrison: "*We are members of a great partnership, and it is the right of each to know what every other member is contributing to the partnership, and*

14

*what he is taking from it*."), others believed that private returns would facilitate more honest reporting of income.  Ultimately, the latter group won out.  But the idea of public taxes, especially for public officials, did not die.[3]  Mr. Littlejohn was well-versed in this history.

### 2.  Context of Offense

*We all began to worry more and more about freedom of the press and about the [] administration's imperious attitude that the authority to determine what the American people should know rests exclusively with the government.*

Katharine Graham, *Personal History* 458 (1997).[4]

### a.  Leak of President Trump's Returns to New York Times

In 2017, two days after taking office, President Trump announced that he would continue to withhold his tax records from the public – "becoming the first president since the early 1970s to decline to release tax information." Julie Hirschfield Davis, *Trump Won't Release His Tax Returns, Top Aide Says*, N.Y. TIMES, (Jan. 22, 2017), https://www.nytimes.com/2017/01/22/us/politics/donald-trump-tax-returns.  Several weeks later, the President labeled a list of major news outlets "the enemy of the American People." Michael M. Grynbaum, *Trump Calls the News Media the 'Enemy of the American People*,' N.Y. TIMES, (Feb. 17, 2017), https://www.nytimes.com/2017/02/17/business/trump-calls-the-news-media-the-enemy-of-the-people.html.  For Mr. Littlejohn, an avid student of history, these events were

---

[3]    *See, e.g.* The Revenue Act of 1924.   In the aftermath of the Teapot Dome scandal, President Coolidge and Treasury Secretary Andrew Mellon reluctantly agreed to the Revenue Act.  The statute made available all 1924 individual and business tax records for public inspection and gave the Chair of the United States House Committee on Ways and Means the power to obtain the records of any taxpayer.

The idea surfaced again during 1970s.  After President Nixon's own tax scandal and resignation, President Ford released a 10-year summary of his tax return information to the public and the White House announced that "the President hopes this will be a model for the degree of detail on tax information that all candidates should issue to voters who they are asking to elevate them to the Presidency."  James M. Naughton, *Ford Paid $94,568 in '75 Taxes*, N.Y. TIMES, (Apr. 21, 1976), https://nyti.ms/420fkl3.  Every major presidential candidate since then, with one exception, has upheld the tradition of releasing their tax information to the public.

[4]    Former *Washington Post* Editor in Chief Katharine Graham recalling in her autobiography the Nixon administration's efforts to control information.

alarming.  He believed it was morally wrong for the administration to withhold information that had always been shared with the American people.

By the time he resumed work as an IRS contractor in the Fall of 2017, Mr. Littlejohn was resolved that he would try to access the President's tax returns if given the opportunity.  When, by chance, in early 2018, his employer assigned him to a project that would allow such access, he began to figure out how to obtain the records through searches that would not raise any red flags. In the months leading up to Mr. Littlejohn actually obtaining the tax records, there were several events that made him feel that he did not have any other choice but to act.[5]  By the end of November 2018, Mr. Littlejohn had successfully obtained 15 years of tax records for the President.

Mr. Littlejohn did not do anything with the information for several months and remained unsure whether he would disclose it.  He considered sharing the records with several news organizations, but wanted to carefully think through the best way to get the information to the American public while at the same time making sure the records themselves would be protected. During that time, he reread the New York Times prior reporting on the President's tax records and watched a documentary that discussed the controls that the Times put in place to handle other sensitive leaked records, such as a secure data room, dedicated private computers, and a walled-off team of journalists.  *See The Family Business: Trump and Taxes* (Moxie Firecracker Films 2018).  Mr. Littlejohn resolved that if he decided to disclose the Trump tax data, he would go to the Times.

---

[5]    These events included the October 1, 2018 swearing-in of a new Commissioner of the IRS who had previously supported the President's decision to withhold his tax returns and an October 2, 2018 New York Times investigative report the tax strategy of the Trump family.  David Barstow, Susanne Craig, and Russ Buettner, *Trump Engaged in Suspect Tax Schemes as He Reaped Riches From His Father*, N.Y. TIMES, (Oct. 2, 2018), https://www.nytimes.com/interactive/2018/10/02/us/politics/donald-trump-tax-schemes-fred-trump.html.

Then two things happened in April 2019 that made up his mind to act.  On April 13, 2019, the New York Times ran an opinion piece, "Everyone's Income Taxes Should Be Public," which argued that "[d]isclosure of tax payments would make it easier to hold politicians accountable [and] also would help to reduce fraud and economic inequality."  Binyamin Appelbaum, N.Y. TIMES, (Apr. 13, 2019), https://www.nytimes.com/2019/04/13/opinion/sunday/taxes-public.html. Two weeks later, Mr. Littlejohn's father was unexpectedly diagnosed ███████████████ ███████████████████████████.  Right after receiving that news and going to see his Dad, Mr. Littlejohn decided to approach the New York Times about leaking Trump's tax records.  On May 14, 2019, Mr. Littlejohn contacted the Times tip line asking to be put in contact with the same reporters who had previously covered the President's taxes.[6]  Reflecting on that day, Mr. Littlejohn wrote in his journal:

> *I remember thinking about my Dad who just a few weeks earlier had been diagnosed* ███████████ *I was thinking about my sister [] and how brief our time on earth is.  If ever I found myself scared to push further I would think about everything I had done so far, everything that led up to this moment and I'd push through.*

At the same time Mr. Littlejohn began his discussions with the New York Times reporters, he began making monthly trips to St. Louis to see his father, who was preparing for ███████████ ███████████████.  Between May 2019 and August 2019, Mr. Littlejohn engaged in multiple discussions, including in-person meetings, with the Times reporters about how they would handle the security of and reporting on the Trump tax records if he were to disclose them.  In response to one of those meetings, one of the Times reporters wrote to Mr. Littlejohn in June 2019:

> *[I]t was great meeting you last night. That was a (really) big step, and we respect the courage it took. I hope we land on a good path forward. I completely respect your concerns and want you to feel right about any decision / decisions you make.*

---

[6]     Including a recently-published New York Times investigative piece, *Decade in the Red: Trump Tax Figures Show Over $1 Billion in Business Losses* (May 8, 2019).

> *. . I can't help but reflect that it's something the three of us ended up together last night because a certain person won't disclose information that people absolutely need to see and have for decades. I appreciate you share this concern and recognize one person can make a difference.*

Based on his discussions with the reporters, Mr. Littlejohn felt that the New York Times shared his belief that the American public had a right to know the President's tax information and would responsibly report on the records he provided.  Specifically, he understood that the New York Times would take similar precautions to its prior reporting on the subject – securely maintain the data, would not publish the records themselves, and would use the information solely for journalistic purposes.

In August 2019, after several months of communications, Mr. Littlejohn gave the NY Times a copy of the tax information that he stolen from the IRS database related to President Trump.  Over the next year, he helped the Times analyze the tax data and stole additional tax records to supplement his initial unauthorized disclosure.

On or about September 27, 2020, the New York Times published the first of several articles that publicly disclosed information contained in President Trump's tax returns, which the defendant provided to the news organization.  *See* Russ Buettner, Susanne Craig, and Mike McIntire, *Long-Concealed Records Show Trump's Chronic Losses and Years of Tax Avoidance*, N.Y. TIMES, (Sep. 27, 2020), https://www.nytimes.com/interactive/2020/09/27/us/donald-trump-taxes.html.  Accompanying the lead article, N.Y. Times Editor in Chief Dean Baquet published the following note:

> *We are publishing this series of reports because we believe citizens should understand as much as possible about their leaders and representatives — their priorities, their experiences and also their finances. Every president since the mid-1970s has made his tax information public.  The tradition ensures that an official with the power to shake markets and change policy does not seek to benefit financially from his actions.*

*Mr. Trump, one of the wealthiest presidents in the nation's history, has broken with that practice. As a candidate and as president, Mr. Trump has said he wanted to make his tax returns public, but he has never done so. In fact, he has fought relentlessly to hide them from public view and has falsely asserted that he could not release them because he was being audited by the Internal Revenue Service.*

*...*

*Our latest findings build on our previous reporting about the president's finances. The records show a significant gap between what Mr. Trump has said to the public and what he has disclosed to federal tax authorities over many years. They also underscore why citizens would want to know about their president's finances: Mr. Trump's businesses appear to have benefited from his position, and his far-flung holdings have created potential conflicts between his own financial interests and the nation's diplomatic interests.*

Dean Baquet, N.Y. TIMES, *An Editor's Note on the Trump Tax Investigation* (Sept. 27, 2020),

https://www.nytimes.com/2020/09/27/us/trump-taxes-editors-note.html.

While the Times reporters did not publish any of the underlying records and used them solely to report on the information contained therein, Mr. Littlejohn recognizes that the information published was a violation of the privacy of President Trump and other affected taxpayers.  He greatly regrets the theft of these records and having disclosed them to the media.

### b.      Leak of Billionaire Tax Returns to ProPublica

While working with the New York Times on the analysis of President Trump's tax records, Mr. Littlejohn noted an anomaly in the data: earlier versions of certain IRS databases truncated numbers with large numbers of digits (for example, registering $1,230,000,000 as $230,000,000). This led Mr. Littlejohn to run queries for taxpayers with large gains and losses to try to figure out the issue with the database.  After repeatedly observing tax records of ultra-high net worth taxpayers with relatively small tax payments, Mr. Littlejohn became increasingly focused on the systemic inequality. At the same time, he was reading a book about income inequality, *The Triumph of Injustice: How the Rich Dodge Taxes and How to Make Them Pay*.  Emmanuel Saez and Gabriel Zucman (2019).  The 2019 book set forth a systematic analysis of the U.S. tax system,

concluding that for the first time in a century, billionaires almost universally paid lower effective tax rates than the average American taxpayer.  It had a profound impact on Mr. Littlejohn's worldview.  While the book suggested solutions to this inequality, Mr. Littlejohn feared that none would be achieved without robust public engagement with the topic.  He began to think about how an in-depth investigative report of the tax histories of ultra-wealthy taxpayers might be the one way to cause meaningful change to reform the tax system.

In June of 2020, Mr. Littlejohn began conducting searches to pull historic tax data on the wealthiest taxpayers.  Basing his methodology on the tax analysis used in *The Triumph of Injustice*, Mr. Littlejohn constructed a query designed to pull the top 500 taxpayers by income by year for the past 15 years.  After running the query, he stole the data set in the same manner as the President's returns, uploading the data to his personal private website but not publicly posting any of the files.  Mr. Littlejohn wrote at the time that disclosing the data to the media "*would almost certainly mean signing my life away to misery.*"  And as before, he did not immediately share the records.

Then, in late August 2020, a close family friend—a young woman in her twenties—died of cancer.  The next day, Mr. Littlejohn wrote in his journal:

> *Life is so fragile and short.  Grieving for the years she will not see the friend[s] and family that will carry her loss for the rest of their days.*
>
> *We should all try to live our lives as if we will die tomorrow.*

The following week, he contacted ProPublica.

Similar to his prior discussions with the New York Times, Mr. Littlejohn also sought assurances from ProPublica as to the security of date and use of the information for journalistic purposes.  Prior to sharing the data, he stripped bank account and other sensitive information from the records.  In September 2020, Mr. Littlejohn anonymously provided send an encrypted USB

drive to a ProPublica journalist.  In or about November 2020, he provided the device's password.

The news organization published nearly 50 articles using the returns and return information. *See*

Jesse Eisinger, Jeff Ernsthausen, and Paul Kiel, *The Secret IRS Files: Trove of Never-Before-Seen*

*Records Reveal How the Wealthiest Avoid Income Tax*, PROPUBLICA, (June 8, 2021),

https://www.propublica.org/article/the-secret-irs-files-trove-of-never-before-seen-records-reveal-

how-the-wealthiest-avoid-income-tax.

### 3.   Aftermath of Leaks

> *Privacy is something to be taken very seriously, and vigilante justice is never the*
> *answer in our republic.  Having said that, from discussions with Mr. Littlejohn, it*
> *is obvious to me that he undertook these actions not for personal enrichment or as*
> *an act of malice, but rather out of a sense of justice, however misguided. Mr.*
> *Littlejohn is not a menace to society; he is a principled, if flawed, man, who acted*
> *irrationally in the midst of what has been a trying, highly emotional time for our*
> *country.*

██████  Letter, attached hereto as part of Exhibit A.  In the months following the publication of

the ProPublica articles, Mr. Littlejohn began to realize the gravity of what he had done.  He

originally acted out of a sense of moral duty, but soon came to understand that his conduct was

morally wrong.  Instead of saving the tax system, his actions had undermined the IRS, breached

the public trust, and violated the privacy of thousands of American taxpayers.

### C.   The Need to Avoid Unwarranted Sentencing Disparities Among Similar Offenders Also Supports Two- to Four-Level Upward Departure.

In determining an appropriate but not greater than necessary sentence, 18 U.S.C. 3553

instructs the Court to look to precedent and the sentences imposed on similarly situated defendants.

The Supreme Court has explained, "Congress' basic goal in passing the Sentencing Act [and

adopting the Sentencing Guidelines] was to move the sentencing system in the direction of

increased uniformity." *United States v. Booker*, 543 U.S. 220, 253 (2005).  The breadth of case

law supports a Guidelines sentence with a two- to four-level upward departure.

1.      **Sentences Imposed in Previous 26 U.S.C. 7213 Cases Support the Requested Sentence.**

As an initial matter, the Government has rarely brought criminal charges for the unauthorized disclosure of tax records.  Undersigned counsel has been able to identify only nine cases charging 26 U.S.C. 7213.  While these cases admittedly involved the disclosure of far fewer tax records, many of them also involved far more egregious circumstances and more condemnable motives than are present here.  These aggravating factors included unlawful disclosures for profit or in exchange for sexual favors, theft of the taxpayers' identities, and otherwise intending to use the tax information to defraud or financially harm the taxpayers.  Despite these highly culpable circumstances, most of these cases resulted in probationary sentences.  *See, e.g., United States v. Herndon*, 1:04-cr-00171 (W.D. Tex.) (sentencing defendant to three months of probation and 100 hours of community service for violating 18 U.S.C. 1030A, 26 U.S.C. 7213, and 26 U.S.C. 7214 by unlawfully accessing the federal income tax accounts of a woman, her sister, and her mother to trade the tax information for sexual benefits); *United States v. Johnson*, 2:07-cr-00309 (E.D. Penn.) (sentencing defendant to three years of probation for selling tax returns and other confidential information for at least 24 individuals for approximately $1,500 with the purpose of allowing the other individual to use the information in fraudulent transactions); *United States v. Washington*, 3:15-cr-00007-JJH (N.D. Ohio) (sentencing defendant to one year of probation after conviction at trial for unlawfully accessing tax information of her ex-husband and unlawfully disclosing the information to an employee of a child support agency); *United States v. Lerner*, 1:12-cr-00952-JFK (S.D.N.Y.) (sentencing defendant to three years of probation for unlawfully disclosing tax information to a non-IRS employee and applying to a private position at a company that he was auditing; the Government dismissed a count for bribery under 18 U.S.C. 207 and a second count under 26 U.S.C. 7213); *United States v. Richey*, 924 F.2d 857 (9th Cir. 1991) (affirming in a split

decision a sentence of probation for disclosing confidential tax information to a reporter about a Judge, who had recently sentenced the defendant to a term of probation in an earlier case; the defendant worked for the IRS and had previously audited the Judge's taxes and suggested to the reporter that the terms of his probation were likely done in retribution);[7] *United States v. Verburg*, 2:03-cr-00341-DB (D. Utah) (sentencing defendant to five years of probation); *United States v. Lewis*, 1:12-cr-00263-LJO-SKO (E.D. Cal.) (sentencing defendant to two years of probation).

The only sentences under 26 U.S.C. 7213 that involved prison time had highly unusual circumstances or defendants who committed additional crimes. *See United States v. Moore*, 2:90-cr-20286 (W.D. Tenn.) (sentencing defendant after conviction at trial of thirteen counts of 26 U.S.C. 7213 to nineteen months of incarceration for unlawfully obtaining the tax information of eight individuals and stealing the identity of one of the individuals to send harassing messages to a Tennessee Senator regarding, among other things, a purported Secret Service kidnapping plot); *United States v. Flowers*, 2:12-cr-00323 (E.D. Penn.) (sentencing defendant to two years of incarceration for aggravated identity theft and a concurrent four months of incarceration for one count of 26 U.S.C. 7213A, one count of 26 U.S.C. 7213, and one count of aiding and abetting mail fraud for unlawfully accessing tax records for numerous individuals, including her former landlord, and using the records to, among other things, apply for credit cards in her landlord's name).

Unlike the above cases, Mr. Littlejohn's disclosure was not self-serving. He did not disclose the information for personal gain; nor did he intend to harm the taxpayers. Rather, he

---

[7]    The dissent in *Richey* would have reversed because the defendant's First Amendment right to challenge the bias of the Judge and the public's First Amendment right to the information outweighed the government's interests at issue, which in the dissent's view should have invalidated the law as applied. Even stronger First Amendment interests are at issue in this case, and we ask that the Court factor in those interests when determining an appropriate sentence.

believed at the time that disclosing the information would benefit society and could bring about positive change.

> **2.      Sentences Imposed in Cases Involving Comparable Non-Tax Disclosures Support the Requested Sentence.**

Because of the dearth of precedent involving the unauthorized disclosure of tax records, particularly in cases involving the disclosure of a larger number of records, the Court should also look to cases where Courts have imposed sentences on similarly situated defendants for comparable, non-tax disclosures. For example, in *United States v. Fry*, Case No. 3:19-cr-00102-EMC (N.D. Cal.), the Government charged Mr. Fry with misuse of a computer, unlawful use of a social security number, and unauthorized disclosure of suspicious activity reports, all of which are five-year felonies. Mr. Fry was an Investigative Analyst for the IRS's law enforcement arm, the Criminal Investigative Division, who abused his access to confidential information and position of trust by leaking five suspicious activity reports related to Michael Cohen to a lawyer named Michael Avenatti who then leaked the information to the Washington Post. The Washington Post used the unlawfully obtained reports to publish an article titled "How Much Flowed Through Michael Cohen's Multi-Purpose Shell Company." Mr. Fry attempted to access additional reports but safeguards in FinCEN's system prevented further unlawful disclosures. Mr. Fry pled guilty to one count of unauthorized disclosure of suspicious activity reports and the Court sentenced him to 5 years of probation.

Further, *United States v. Edwards*, Case No. 1:19-cr-00064-GHW-1 (S.D.N.Y.), the Government charged Ms. Edwards with conspiracy to make thousands of unauthorized disclosures of suspicious activity reports in violation of the Bank Secrecy Act. Ms. Edwards was a senior Treasury Department official who abused her position of trust and unlawfully disclosed over 50,000 documents, including thousands of confidential reports on suspect financial transactions

and other sensitive personal and financial information related to, among other things, Special Counsel Robert Mueller's investigation into then-President Trump and his allies, to Buzzfeed. The unlawful disclosures led to several articles by Buzzfeed, including a series of articles titled the FinCEN files.

There are several significant parallels between Ms. Edwards' and Mr. Littlejohn's motive and conduct. Like Mr. Littlejohn, Ms. Edwards disclosed tens of thousands of records to a news organization because she believed (rightly or wrongly) that the public had a right to know about what she viewed as an injustice. Also, like Mr. Littlejohn, she also believed (rightly or wrongly) that the unlawful disclosure would benefit society. When leaking the documents to the reporter, Ms. Edwards, who had significant experience in the intelligence community, applied what the Government described as "spy-style tradecraft" to avoid detection. *See United States v. Edwards*, Case No. 1:19-cr-00064-GHW-1 (S.D.N.Y.), Dkt. 104 at 26. The impact of Ms. Edwards unlawful disclosure is also similar to Mr. Littlejohn's in that it led to a series of articles involving sensitive financial information about private citizens.

In some respects, Ms. Edwards conduct was more egregious than Mr. Littlejohn's. Not only did Ms. Edwards' disclosure, and the corresponding Buzzfeed articles, invade the privacy interests of those whose records she disclosed, her disclosure also compromised ongoing law enforcement investigations, including into the financing of the terrorist organization Hezbollah. Further, when initially discovered, Ms. Edwards lied to FBI agents. These aggravating factors are not present in Mr. Littlejohn's case.

In determining an appropriate sentence, the Court in Ms. Edwards' case faced a similar sentencing framework as the Court must now apply here. The unlawful disclosure of confidential suspicious activity reports under 31 U.S.C. 5322(a), and her conspiracy to violate it, is also a five-

year felony and her sentencing guideline range was 0 to 6 months.  Like Mr. Littlejohn, Ms. Edwards' sentencing guidelines did not specifically account for the number of suspicious activity reports she unlawfully disclosed. Nor did it account for the type of information she disclosed or the harm her disclosure caused, like compromising ongoing criminal and anti-terrorism investigations (a harm that is not present for Mr. Littlejohn). Despite the large number of records Ms. Edwards unlawfully disclosed (over 50,000 internal government records, including over 2,000 suspicious activity reports) and the significant harm the disclosure caused, the Court found that a departure was not warranted.  *See United States v. Edwards*, Case No. 1:19-cr-00064-GHW-1 (S.D.N.Y.), Dkt. 104 at 6 ("I considered whether there is an appropriate basis for departure from the advisory range within the guidelines system, and while I recognize that I have the authority to depart, I do not find any other grounds warranting a departure under the guidelines").  While this Court, like the Court in Edwards, has authority to depart, as explained above, the departure must be grounded by precedent and the guidelines.

Applying this framework, the Court sentenced Ms. Edwards to six months of incarceration, the upper end of her guideline range.  Ms. Edwards' six-month sentence and Mr. Fry's probationary sentence supports Mr. Littlejohn's requested Guidelines sentence with a two- to four-level upward departure.

### 3. Sentences Imposed for the Significantly More Egregious Crime of Disclosing Confidential Information Support the Requested Sentence.

Another significant area of unlawful disclosure cases involves significantly more egregious and harmful conduct – the disclosure of confidential information.  The conduct in these cases is not commensurate with Mr. Littlejohn's conduct.  While Mr. Littlejohn breached the confidences of taxpayers, these cases involve disclosures that harm national security and put individuals' lives at risk. Congress has appropriately codified significantly harsher criminal statutes for such

disclosures,[8] and significantly higher sentencing guidelines apply.  *See* USSG 2M3.3 (base offense level of 24 or 29 if disclosure involved top secret information).  However, even in the context of this significantly more egregious conduct, courts frequently sentence defendants to far below the guidelines when the defendants' motive was a feeling of moral obligation or belief that society would benefit from the disclosure.

| Name/Case No. | Guidelines | Sentence | Description of Case |
| --- | --- | --- | --- |
| *US v Albury* (0:18-cr-00067, Western District of Minnesota) | 46-57 months | 48 months' incarceration; 3 years' supervised release | In 2016, Albury, an FBI Special Agent who had previously served in Iraq, removed 70+ documents (50 of which were classified) from FBI computer systems with the intent of providing them to the media.  The materials related to FBI surveillance, profiling, and informant-recruitment practices in national security investigations. At least some of the documents were in fact released to the media and ~50 more documents were found in an envelope with the reporter's name during the execution of the search warrant. The defendant used a variety of means to exfiltrate the information to avoid detection. |
| *US v Cartwright* (1:16-cr-00188, District of Columbia) | 0-6 months | Govt. requested 24 months; Pardoned prior to Sentencing | In 2017, retired Marine Corps General and Vice Chairman of the Joint Chiefs of Staff Cartwright violated his position of trust by (1) leaking highly classified information, including Top Secret/SCI information about a covert program to sabotage Iranian nuclear centrifuges, to reporters on multiple occasions and (2) lying to the FBI in an effort to conceal his crimes. He was permitted to plead guilty to lying about the offense to the FBI rather than the substantive offense. |

---

[8]     18 U.S.C. 793(e) (providing a 10-year felony for unlawful retention of national defense information); 18 U.S.C. 798 (providing a 10-year felony for unlawful disclosure of classified information).

| Name/Case No. | Guidelines | Sentence | Description of Case |
|---|---|---|---|
| *US v Frese* (1:19-cr-304, Eastern District of Virginia) | 151-188 months | 30 months' incarceration; 3 years' supervised release | Over a 17-month period from February 2018 and October 2019, Frese transmitted Top Secret and Secret information to reporters and an overseas consultant on at least 19 occasions, including running searches as requested by reporters. The Government, in a sealed addendum, detailed the actual harm that Frese's unlawful disclosure of classified information caused. |
| *US v Fondren* (1:09-cr-263, Eastern District of Virginia) | 63-78 months | 36 months' incarceration; 2 years' supervised release | In 2009, Fondren knowingly disclosed classified information to a foreign government operative for money. From approximately November 2004 to February 2008, Fondren provided classified Defense Department documents and other sensitive information. He denied the offense and was found guilty at trial. At sentencing, the Court departed downward after finding out that the classified information conveyed was not actually harmful to the US. |
| *US v. Hale* (1:19-cr-00059, Eastern District of Virginia) | 108-135 months | 45 months' incarceration; 3 years' supervised release | In 2013, Hale abused his position of trust at the National Geospatial-Intelligence Agency (NGA) by disclosing classified documents to reporters on multiple occasions. The documents that the news organization later published harmed the United States and were of sufficient interest to ISIS for the terrorist organization to further distribute two of the unlawfully leaked documents in a guidebook for its followers. |
| *US v Kim* (1:10-cr-2255, District of Columbia) | 120 months (capped by statute) | 13 months' incarceration; 1 year' supervised release | Kim was a senior advisor at the State Department who disclosed TOP SECRET/SCI information to a reporter regarding North Korean military preparedness. He admitted (1) that he did not act to expose government misconduct, (2) he did not disclose as a whistleblower, and (3) that he knew his disclosure could harm the United States or benefit North Korea. Kim also lied throughout the FBI's investigation. |

| Name/Case No. | Guidelines | Sentence | Description of Case |
|---|---|---|---|
| *US v Kiriakou* (1:12-cr-127, Eastern District of Virginia) | 97-121 months | 30 months' incarceration; 3 years' supervised release | Kiriakou, a former CIA officer, disclosed classified information to journalists, including the identity of a covert agent that caused grave damage to national security and risked the personal safety of the agent. His disclosures further compromised a second covert agent and dozens of CIA officers (including covert officers of the National Clandestine Service). Kirkiakou disclosed the classified material for personal gain, including promoting his forthcoming book and securing employment. |
| *US v Leibowitz* (8:09-cr-632, District of Maryland) | 46-57 months | 20 months' incarceration; 3 years' supervised release | Leibowitz was employed as an FBI linguist, and he transmitted five documents to a blogger that contained "Secret" classified communication intelligence. The blogger published the classified intelligence on the internet, compromising the intelligence sources and methods used to gather the classified information. |
| *US v Libby* (1:05-cr-394, District of Columbia) | 30-37 months | 30 months' incarceration imposed by court but commuted by President; 2' years supervised release | Around 2003, Libby was a senior White House aide who revealed the identity of a covert CIA agent to a reporter in retribution for a critical article written by the agent's husband. The Government charged Libby with obstruction and false statements as opposed to disclosing classified information, but the Court applied a cross-reference to the substantive offense of violating the Intelligence Identities Protection Act. |

| Name/Case No. | Guidelines | Sentence | Description of Case |
|---|---|---|---|
| *US v Petraeus* (3:15-cr-47, Western District of North Carolina) | 0-6 months | 2 years' probation; $100k fine | Petraeus was a retired four-star General and CIA director. A personal acquaintance wrote a biography about him, for which he revealed eight notebooks with classified information, including the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions from high level National Security Council meetings, and notes of discussions with the President. Much of the information was classified at the highest level of "'Top Secret/SCI and codeword'". Petraeus also lied to FBI during the investigation. The Government charged Petraeus with unauthorized retention opposed to the more serious crime of unlawful disclosure. |
| *US v Sachtleben* (1:13-cr-00200, Southern District of Indiana) | 168-210 months | 43 months' incarceration (Consecutive term of incarceration for distribution of child pornography) | From 2010 to 2012, Sachtleben, formerly with the FBI, began disclosing information about the explosives used in terrorist plots and the FBI's analysis of such explosives to a reporter. In 2012, Sachtleben obtained classified material about a recently disrupted suicide bomb attack and provided it to the reporter. The material was classified by the FBI and other intelligence agencies. The reporter published multiple articles relying on the classified material. |
| *US v Shriver* (1:10-cr-402, Eastern District of Virginia) | 37-46 months | 48 months' incarceration; 2 years' supervised release | In exchange for $70,000 from the Chinese government, Shriver applied for positions in the foreign service and the CIA with the agreement that he would pass along classified information upon employment. Shriver met with several PRC agents on multiple occasions over the time span of three years, and he additionally smuggled money into the United States. He accepted responsibility for the crime and did not actually distribute any classified information. |

| Name/Case No. | Guidelines | Sentence | Description of Case |
|---|---|---|---|
| *US v Sterling* (1:10-cr-485, Eastern District of Virginia) | 235-293 months | 42 months' incarceration, 2 years' supervised release | A jury convicted Sterling for disclosing information about the Iranian nuclear program to the New York Times. Former National Security Advisor Dr. Condoleezza Rice said that any article about the program would endanger lives and national security by compromising one of the most important, closely held, and sensitive operations of her entire tenure as National Security Advisor. Although the White House and Dr. Rice convinced the New York Times to not publish the story, the reporter at the New York Times later disclosed the classified information in his book, *State of War*. |
| *US w Winner* (1:17-cr-34, Southern District of Georgia) | 87-108 months | 63 months' incarceration, 3 years' supervised release | Winner was an NSA contractor and former Air Force linguist who disclosed an intelligence report classified Top Secret/SCI in 2017. She also "'expressed contempt for the United States'" and claimed to hate the United States in a series of online posts. The government claimed that the disclosure caused "exceptionally grave harm to US national security". |

Mr. Littlejohn's sentence should fall well below the sentences imposed in these cases. Not only did the above cases harm national security, but as noted above, many involved lying to investigators and putting individuals' lives at risk. None of these aggravating factors is present here.

Mr. Littlejohn never lied to investigators, and he accepted responsibility for his conduct, saving the government the time and resources of trial. Mr. Littlejohn cooperated fully, including two lengthy proffers to the Department of Justice and TIGTA. As part of his cooperation, Mr. Littlejohn has turned over all relevant electronics, including disclosing the existence of electronics that the Government would never have been aware of without his cooperation. Mr. Littlejohn

further shared ways TIGTA could better detect and deter future theft and illegal disclosure of IRS data.  The obstruction enhancement in this case is based on Mr. Littlejohn's contemporaneous acts to prevent detection; he has not taken any obstructive acts since he became aware of the investigation in 2021.

In contrast to putting lives at risk, Mr. Littlejohn took steps to protect the privacy of individuals.  First, Mr. Littlejohn only approached reputable news organizations – the New York Times and ProPublica – that he knew would handle the information responsibly.  He then obtained repeated assurances from the organizations that they would invest significant resources to store the information securely before he transferred any of the records.  Finally, Mr. Littlejohn removed bank account information from the records he transferred to ProPublica.

These differences support a sentence far below the sentences imposed in the above cases involving the disclosure of classified information.

### d.    The Purposes of Federal Sentencing.

As noted above, Congress has identified four purposes of federal sentencing that district courts must follow.  The sentence must be "sufficient, but not greater than necessary" to serve those purposes.  We respectfully submit that the purposes of federal sentencing would be fully served by imposition of a Guidelines sentence with a two- to four-level upward departure.

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  The consequences of Mr. Littlejohn's conviction will extend far beyond the sentence imposed by the Court.  Not only has Mr. Littlejohn been convicted of a serious felony, but one that will prohibit him from ever working again in federal consulting or similar fields.  He will never be able to serve the government

in the same way again, putting an end to an otherwise promising career.  The consequences on his personal life are even more profound.  As his partner, ███████████ shared:

> Living together, I've been able to see firsthand how difficult coming to terms with his conduct has been and the monumental impact on his family and loved ones. Mr. Littlejohn sacrificed his future aspirations committing this crime and received nothing for it. He lost the ability to hold a normal job, time with his father and watching his nieces and nephew grow up, starting a family with me. The only reason he would do this is if he believed he was contributing to the greater good by providing invaluable information to the public.
>
> ...
>
> He never thought of the ripple effect his conduct would create upon those he's loved, and he'll carry that weight for the rest of his life.

███████ Letter, attached hereto as part of Exhibit A.  The personal and professional consequences of his conduct, coupled with a period of incarceration, adequately reflect the serious nature of his crime and provides just punishment under the full circumstances of his offense and cooperation.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."  We respectfully submit that period of incarceration grounded in the guidelines and precedent would provide adequate deterrence.  First, there is no reason to believe Mr. Littlejohn is personally at risk of breaking the law in the future.  Other than the unlawful disclosures at issue in this case, which took place during an incredibly difficult and emotional period in his life, Mr. Littlejohn has lived a law-abiding and community-focused life.  Many friends shared their belief in Mr. Littlejohn's redemption, including longtime friend ███████████

> I hope for a future where Chaz can rebuild his life and continue contributing positively to society, as I know he is capable. His actions, though legally wrong, were not driven by personal gain, but by a desire to do what he believed was right. It is my sincere belief that Chaz can learn from this experience and emerge as an even more valuable member of our community.

███████ Letter, attached hereto as part of Exhibit A.

In addition to any term of punishment this Court may impose, the highly publicized nature of this case has already led to significant and lasting consequences for Mr. Littlejohn, his family

and friends.  It has also sent a strong message of general deterrence to the greater public.  Mr. Littlejohn's name, photograph, and personal details have appeared in virtually every form of news media.  Journalists have shown up at his house and published information about his family.  At least one major news network has repeatedly aired a conspiracy theory about the case, including multiple false claims about Mr. Littlejohn.  Comments to many of the online news articles include violent threats against Mr. Littlejohn, including that he should be burned alive or publicly hanged. The extent and nature of the media coverage, regardless of Court's sentence, has already sent a strong and very public message of deterrence.[9]

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  We respectfully submit that neither the public nor the government require further protection from Mr. Littlejohn.  To begin with, he will never again have access to tax records, or any other confidential government information.   Moreover, his personal history and characteristics, coupled with the manner in which he assisted the government's investigation, demonstrate that Mr. Littlejohn is ordinarily a conscientious and law-abiding citizen and will not recidivate.

As ▆▆▆▆▆ wrote to the Court:

> [I]n all my discussions with him, Charles has been upfront about what he did, clear that what he did was wrong, has been very concerned about and apologized for the harm his actions have caused others, and has not blamed others or tried to deflect blame in any way from himself.  I think it is very clear to Mr. Littlejohn that this is a pivotal moment in his life — I think, too, he recognizes that, as a result of his actions, his life has changed forever.

▆▆▆▆▆ Letter, attached hereto as part of Exhibit A.

---

[9]      *See* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner."  Mr. Littlejohn does not currently need any specific training, medical care, or treatment.  That said, he is committed to use his incarceration to better himself and give back to others.

In the words of Mr. Littlejohn's best friend:

> *I acknowledge the necessity of accountability, but I am deeply concerned about the impact of his absence on his partner* ███████, *as well as his parents and family. I will also be selfish enough to include myself; not only is he my business partner, he is also my best friend. The weight of this situation extends far beyond Chaz and places an immense burden on those closest to him. Chaz and* ███████ *want to have children together, and a long prison sentence would diminish their chances of doing so. I know that Chaz has remorse for his actions and how they've impacted the victims as well as those in his own life.  Your Honor, I respectfully ask you to consider Chaz's moral character, the circumstances that have shaped him and his choices, and the broader impact of your decision.*

████████████ Letter, attached hereto as part of Exhibit A.

## III.   CONCLUSION

For the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Charles Littlejohn humbly requests that this Court impose a Guidelines sentence with a two- to four-level upward departure.

Date:  January 17, 2024

Respectfully submitted,

/s/ _____
Lisa Manning
Noah Cherry
Schertler Onorato Mead & Sears, LLP
555 13th Street, N.W.
Suite 500 West
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
lmanning@schertlerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of January, 2024, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/_____
Lisa Manning
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, N.W.
Suite 500 West
Washington, DC  20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
lmanning@schertlerlaw.com

36